GEORGE W. HUGUELY, IV, Plaintiff,
v.
JAMES M. MRAZ, and wife, HEIDI P. MRAZ, Defendants.
No. COA07-295
Court of Appeals of North Carolina.
Filed November 6, 2007
This case not for publication
Vandeventer Black, LLP, by Norman W. Shearin, Jr. and Allison A. Holmes, for Plaintiff-Appellee.
Sharp, Michael, Outten & Graham L.L.P., by David R. Tanis, for Defendants-Appellants.
ARROWOOD, Judge.
James M. Mraz (Defendant) and Heidi P. Mraz (together, Defendants) appeal from an order granting a new trial in favor of George W. Huguely, IV (Plaintiff). We affirm.
The relevant evidence is summarized as follows: On 3 July 1998, Plaintiff offered to purchase property located at 809 Lighthouse Drive, Corolla, North Carolina, for $357,500.00, making a $5,000.00 earnest money deposit. The sellers accepted Plaintiff's offer, and the closing date was set for 12 September 1998. At that time, Plaintiff and his estranged wife were undergoing a divorce. Entry of Plaintiff's final divorce judgment was continued to November 1998, two months after the closing date, and consequently, the First Union loan officer with whom Plaintiff arranged to finance the purchase decided not to extend the loan to Plaintiff. First Union's representative explained that the continuance of Plaintiff's divorce created financial uncertainty. Attorney John Gaw (Attorney Gaw) testified, "the bank wanted his wife to sign the deed of trust and maybe some other loan documents[.]" Defendant said, "[Plaintiff] did not want [the property] to somehow get involved in his divorce proceedings and somehow entangle[d.]" Plaintiff attempted to extend the closing date and obtain financing after the finalization of his divorce, but the sellers would not extend the date. Rather than lose the contract, Plaintiff sought a partner.
Plaintiff contacted Defendant with a proposal regarding the property. Plaintiff testified:
I really loved that property and I didn't want to lose it. I told [Defendant] that the deal was going down. I asked for an extension. I couldn't get the extension and that if I didn't have a partner to close in their name in the next week, I would lose the deal. So I proposed a joint venture, partnership to [Defendant] where he would take the property down in his name. I would then design [the property], renovate it and build it, supply the materials at my cost. We would then . . . transfer it to a limited liability company. . . . I had come up with a name for the limited liability company called Corolla Associates. I explained that we would then own the property and operate the property as partners, 50/50 partners in Corolla Associates. Our families could use it. . . . He and I talked about the deal. . . . He said, he lik[ed] the deal. It sounded good to him. We shook hands.
On 30 September 1998, approximately ten days after Plaintiff and Defendant met, Defendant purchased the property, making a down payment of $60,461.53. At that time, Defendant had not visited 809 Lighthouse Drive. The $5,000.00 earnest money deposit that Plaintiff paid was applied toward the purchase price of the property. The amount owed, $296,000.00, was supplied from Defendant's loan from First Union Bank, the terms of which were prearranged by Plaintiff.
After the purchase, Plaintiff and Defendants discussed renovation of the property, and Plaintiff supervised the process. Plaintiff estimated the cost of renovation to be approximately $100,000.00 to $120,000.00. Defendant obtained an equity line and made payments to Plaintiff for renovations, which Plaintiff initially deposited into the 809 Lighthouse Drive checking account. However, on 22 July 1999, Corolla Associates, LLC, was formed, and Plaintiff established a checking account for Corolla Associates, LLC, into which he began depositing Defendant's payments. Plaintiff contributed approximately $75,000.00 of his own money to the project, often in the form of checks to Defendant for half of the mortgage payment. When Plaintiff engaged in manual labor on the renovation project, Plaintiff was paid $20.00 per hour for his work.
After the renovation was completed, Plaintiff and Defendants shared 809 Lighthouse Drive with their families, consistent with Plaintiff's original proposal in 1998. Plaintiff and Defendant also arranged a schedule for summer use and for rental of the property, and Defendant consulted with Plaintiff before allowing third parties to use the property. However, Defendant did not transfer title of the property to Corolla Associates, LLC, pursuant to the alleged partnership agreement between Plaintiff and Defendant.
Several drafts of an operating agreement were circulated between Plaintiff and Defendants, but the drafts were never signed. Plaintiff nonetheless received statements from Defendant's accountant, which "updat[ed] [Plaintiff] on the current financial status of the North Carolina property" and detailed the steps necessary "for each partner to be on an equal footing." Despite repeated email exchanges regarding the transfer of title of the property to Corolla Associates, LLC, and emails about "settling up," Defendant kept the title to the property in his name. Defendant testified at trial that the property was "probably [worth] over two million dollars."
As time passed, Plaintiff learned that Defendant had removed Plaintiff as a beneficiary of the insurance policy on the property, and in late summer of 2002, Plaintiff and Defendant had a "heated" conversation: Plaintiff "told [Defendant] that . . . I did everything I promised to do with our partnership. You know, I [renovated] the house[.] I delivered everything I said I would do. I made him and [his wife] a lot of money, and now he's trying to screw me, and . . . I was very disappointed[.]" Finally, in a letter to Plaintiff dated 16 May 2003, Defendant gave Plaintiff the following warning:
I want to impress upon you that I have no tolerance for you or those connected with you being found on the property. I have relatives in the area and others who observe the house on a regular basis. They have been instructed to call me immediately if any intruder is seen on the property. I would then call the sheriff who in turn would arrest any intruder for trespassing whether still there or not. This delivery constitutes my formal notice . . . not to trespass.
On 3 June 2003, Plaintiff commenced an action against Defendant seeking dissolution of the alleged partnership.
On 10 April 2006, the matter came to trial, and on 14 April 2006, a jury returned a verdict in Defendants' favor, finding that Defendant and Plaintiff did not enter into a partnership or joint venture concerning 809 Lighthouse Drive. On 17 May 2006, the court entered judgment against Plaintiff. On 25 May 2006, Plaintiff filed a N.C. Gen. Stat. § 1A-1, Rule 59(a) motion for a new trial, which the court granted in an order entered 21 August 2006. From this order, Defendants appeal.

Rule 59: New Trial
Defendants contend that the trial court erred by granting Plaintiff's N.C. Gen. Stat. § 1A-1, Rule 59 motion for a new trial. We disagree.
N.C. Gen. Stat. § 1A-1, Rule 59(a)(7) (2005) authorizes the trial court to grant a new trial based on the "[i]nsufficiency of the evidence to justify the verdict[.]" In this context, the term "'insufficiency of the evidence' means that the verdict ' was against the greater weight of the evidence.'" In re Buck, 350 N.C. 621, 624, 516 S.E.2d 858, 860 (1999) (quoting Nationwide Mut. Ins. Co. v. Chantos, 298 N.C. 246, 252, 258 S.E.2d 334, 338 (1979)). "The trial court has discretionary authority to appraise the evidence and to `order a new trial whenever in his opinion the verdict is contrary to the greater weight of the credible testimony.'" Id. (quoting Britt v. Allen, 291 N.C. 630, 634, 231 S.E.2d 607, 611 (1977)) (internal quotation marks omitted).
This Court's review of a trial court's discretionary ruling granting a new trial is strictly limited to the determination of whether the record affirmatively demonstrates an abuse of discretion by the court. Worthington v. Bynum and Cogdell v. Bynum, 305 N.C. 478, 482, 290 S.E.2d 599, 602 (1982). "Because `the trial court has directly observed the evidence as it was presented and the attendant circumstances, as well as the demeanor and characteristics of the witnesses,' a trial court's ruling on a motion for new trial is given great deference." Kummer v. Lowry, 165 N.C. App. 261, 263, 598 S.E.2d 223, 225, disc. review denied, 359 N.C. 189, 605 S.E.2d 153 (2004) (quoting Buck, 350 N.C. at 628, 516 S.E.2d at 863). "'[A]n appellate court should not disturb a discretionary Rule 59 order unless it is reasonably convinced by the cold record that the trial judge's ruling probably amounted to a substantial miscarriage of justice.'" Anderson v. Hollifield, 345 N.C. 480, 483, 480 S.E.2d 661, 663 (1997) (quoting Campbell v. Pitt County Memorial Hosp., Inc., 321 N.C. 260, 265-65, 362 S.E.2d 273, 275-76 (1987)). In the instant case, the sole question for the jury at trial was whether Defendant and Plaintiff entered into a partnership or joint venture concerning the property located at 809 Lighthouse Drive. In Miller v. Rose, 138 N.C. App. 582, 532 S.E.2d 228 (2000), this Court discussed partnerships formed by parole agreements:
"A partnership may be formed by an oral agreement. Even without proof of an express agreement to form a partnership, a voluntary association of partners may be shown by their conduct. A finding that a partnership exists may be based upon a rational consideration of the acts and declarations of the parties, warranting the inference that the parties understood that they were partners and acted as such. [A] course of dealing between the parties of sufficient significance and duration . . . along with other proof of the fact [may] be admitted as evidence tending to establish the fact of partnership, provided it has sufficient substance and definiteness to evince the essentials of the legal concept, including, of course, the necessary intent."
Id. at 586, 532 S.E.2d at 232 (quoting Potter v. Homestead Preservation Assn., 330 N.C. 569, 576-77, 412 S.E.2d 1, 5-6 (1992)). Furthermore, "[p]roperty acquired by purchase or otherwise on account of the partnership is partnership property, as is property acquired with partnership funds, unless a contrary intention appears."Potter, 330 N.C. at 577, 412 S.E.2d at 6 (citing N.C. Gen. Stat. § 59-38(a) (2005)).
In the instant case, Plaintiff presented evidence tending to show an oral agreement and "'acts and declarations of the parties, warranting the inference that the parties understood that they were partners and acted as such.'" Miller, 138 N.C. App. at 587, 532 S.E.2d at 232 (quoting Potter, 330 N.C. at 576-77, 412 S.E.2d at 5-6). The evidence included Plaintiff's own testimony: "I told [Defendant] my plan. We shook hands. I trusted him. We had an agreement, an oral agreement."
The evidence admitted at trial also includes the testimony of Attorney Gaw, who reported "discussions about the possibility of [titling the property to] a corporation or a LLC and . . . aspects of those two business entities." Attorney Gaw testified:
[I]t's my best recollection that I believe that we tried to see if the loan could be closed using a business entity in his own name that we could form for him. For whatever reason, the bank was not willing for him to form an LLC or corporation and close this particular loan using one of those entities. So at some point before the closing, [Plaintiff] indicated to me that [he] had begun having some discussions with [Defendant][.] . . . [Defendant] was informed of his dilemma or this problem and was willing to help him by taking title and closing the loan. . . . [T]hey were going to make adjustments in the title and whatever their arrangements were after that closing.
The evidence further shows that, on two occasions, Attorney Gaw received payment "for legal work [with funds] . . . that either came out of 809 Lighthouse Drive or it came out of Corolla Associates[,] . . . for legal work that he did for the partnership."
Attorney Gaw prepared a detailed operating agreement for Corolla Associates, LLC, and signature lines were prepared for Plaintiff and Defendant as managers; however, the operating agreement was never signed. At Plaintiff's request, Attorney Gaw also prepared a deed conveying the property from Defendants to Corolla Associates, LLC, but Attorney Gaw stated that "I have no indication in my file that the original of this deed was [ever] signed or recorded." Attorney Gaw sent the prepared deed, along with a "transmittal letter" dated 27 September 2001 and an "affidavit of consideration," to Defendant.
When questioned about his own monetary contributions to the alleged partnership, Plaintiff stated that he would pay:
[w]hatever money I was obligated for my 50 percent of the deal. . . . I put five or six thousand dollars in the account after the deal closed, just to get the operating account moving so we could pay bills and get some work in the house done. I put in my own money before [Defendant] put . . . any of his money in the deal. . . . I told him I would be obligated for everything after we closed[,] that I would be obligated for everything 50/50.
At trial, Plaintiff also explained the process of renovation of the home and his role and investment in the process:
To the best of my knowledge, sir, the accounting shows that I put $75,000.00 in the project. Of that $75,000, $55,000 went directly to construction, labor and materials. . . . [Defendant] put in [$175,000.00]. I put in [$75,000.00] and covered everything, the construction, all the cost of the job, overdraft fees, miscellaneous expenses, money that came out for various things. And at the end of the day, the accounting shows the numbers are there[.]
Giving a more detailed explanation of his investment, Plaintiff testified:
Q: . . . What was the total for the year 2000?
A: The total deposits I made for the year 2000 were $52,400.
Q: . . . Do you have on your schedule a total for the list of deposits you made for 2001?
A: Yes, sir. Total deposits that I made for 2001 was $12,800.
Q: All right. And do you have a total for the deposits for 2002 on that schedule?
A: Yes, sir. The total deposits I made in 2002 were $10,460.
Q: All right. And do you have . . . the total then of the deposits that you made according to the bank statements?
A: Okay. According to the bank statements the total deposits I made was $75,885.
The evidence also includes a memorandum dated 6 April 2001 from Defendant's accountant to Plaintiff, stating that "in order for each partner . . . to be on equal footing, [Plaintiff] would need to reimburse [Defendant] for one half of his investment, $12,683.65." Plaintiff also wrote a letter to Defendant, dated 14 November 2001, in which Plaintiff said:
Pursuant to our agreement and ownership of the referenced property, enclosed please find a final accounting for the renovation/ remodeling work. As agreed, we decided to remodel the second floor bathroom and settle up the accounts and adjust everything to reflect our 50/50 ownership when the work was complete. The work has been completed and I have enclosed the final construction accounting for your review[.] . . . As per our agreement, when the final accounting is agreed upon by both parties, and the monies are adjusted to reflect 50/50 contributions by both partners, the property will be deeded to Corolla Associates, LLC. If you remember Corolla Associates, LLC was set up to own and operate [the property] with [Defendant] 50% owner and [Plaintiff] 50% owner. Due to the final accounting and cash accounts needing to be adjusted, the conveyance has not taken place. John Gaw has prepared the Deed and the necessary paper work for the Deed of Conveyance.
The evidence further reveals that Plaintiff and Defendant discussed and completed a detailed schedule for summer rental and for each family's use of the property.
Q: . . . [T]ell us what your agreement with him was concerning each family's use of the property[.] . . .
A: This was [Defendant's] idea and I went along with it. He said that we could come up with a rental rate for what the house would rent for on a weekly basis, and that we would then pick dates that his family would use it and my family would use it, and then since the accounting was still open and we were still trying to finalize the accounting, . . . we would have a credit based on the rental use of the property. So for example if [Defendant] used it for six weeks and I used it for three weeks, then technically [Defendant] would owe Corolla Associates three weeks' worth of rent[.]
Plaintiff introduced as evidence the email correspondences between Plaintiff and Defendant detailing the schedule for summer use of the property and a detailed rental schedule for the summer of 2001. The following e-mail was also admitted as evidence:
Q: What is [this e-mail]?
A: It's an e-mail from [Defendant] to [Plaintiff], and it says: George, my Dad and his wife would like to use the house these days. JM. . . .
Q: . . . [A]re there two parts[?]
A: Right. I think the top part references that [Defendant] had e-mailed me back that his father's stay in the house was going to be the 19th through the 26th, and then the bottom part was my response back which said  I'll incorporate the rental income into the final numbers and that the dates for your father to use the property are fine and [sic] that it was okay for your father to stay there for free.
An insurance policy from Public Western Insurance was also admitted as evidence, showing liability, fire and contents coverage of 809 Lighthouse Drive, which was insured in both Plaintiff and Defendants' names; Plaintiff's office address was on the insurance policy. Defendant, however, later removed Plaintiff's name as beneficiary of the policy.
In summary, the evidence presented at trial included email correspondences between Defendant and Plaintiff asking what a fair price would be to rent "our house," discussing "unwind[ing]" proposing that Plaintiff float offers to "buy [Defendant] out," and acknowledging Plaintiff's interest in the home's equity; checks written by Plaintiff for one half of the monthly mortgage payment; a detailed schedule of payments made by Plaintiff into the Corolla Associates, LLC, checking account totaling approximately $75,000; memos from Defendant's accountants detailing contributions of each "partner"; and emails between Defendant and Plaintiff scheduling each family's summer use of the property.
In light of the foregoing evidence, we cannot say the trial court's decision to grant a new trial was "manifestly unsupported by reason" or "so arbitrary that it could not have been the result of a reasoned decision." The court did not abuse its discretion in ruling that the jury's verdict was contrary to the greater weight of all the evidence in the case. Therefore, we will not disturb the trial court's order granting a new trial.
Affirmed.
Chief Judge MARTIN and Judge STROUD concur.
Report per Rule 30(e).